VERIZON MARYLAND INC.

v.

CORE COMMUNICATIONS, INC., et al.

Civil No. JFM–08–503.

United States District Court, D. Maryland.

June 30, 2009.

Kirsten M. Eriksson, Miles and Stockbridge PC, David Anthony Hill, Verizon Maryland Inc., Baltimore, MD, for Verizon Maryland Inc.

Louis J. Rouleau, Cathy A. Hinger, Womble Carlyle Sandridge and Rice PLLC, Joseph Paul Bowser, Arent Fox LLP, Washington, DC, Douglas R.M Nazarian, Maryland Public Service Commission, Baltimore, MD, for Maryland Public Service Commission, Steven B. Larsen, Harold D. Williams, Allen M. Freifeld and Susanne Brogan Lawrence Brenner.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

Plaintiff Verizon Maryland Inc. ("Verizon"), formerly known as Bell Atlantic–Maryland, Inc., filed this complaint for declaratory and injunctive relief, alleging that defendant Maryland Public Service Commission ("PSC") issued orders in a proceeding brought by Core Communications, Inc. ("Core") that violated the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56 ("1996 Act"). Now pending is Verizon's motion for summary judg-

ment. The issues have been fully briefed and no hearing is necessary. Local Rule 105.6.

## I.

Prior to 1996, local telephone companies, also known as local exchange carriers ("LECs"), operated exclusive franchises within their local service areas. The 1996 Act sought to replace this monopoly with a competitive marketplace for local telephone services. To foster competition, the 1996 Act requires incumbent LECs ("ILECs") in local markets to make their existing facilities and networks available to potential competitors. *See Verizon Maryland Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Specifically, as relevant here, the ILEC must "provide ... interconnection with" its existing network to new local carriers, referred to as Competitive LECs ("CLECs"). 47 U.S.C. § 251(c)(2). Interconnection allows callers who subscribe to a competitor's service to receive calls from, and place calls to, individuals who subscribe to the incumbent's service. Under Section 251(c)(2) of the governing statute, interconnection must be "at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection," permitted by the incumbent "at any technically feasible point within the carrier's network," and provided "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* § 251(c)(2)(B)-(D).

To fulfill their duties under the Act, ILECs are required to enter into contracts—termed interconnection agreements ("ICAs")—with CLECs. The parties have a "duty to negotiate in good faith" the terms and conditions of the agreement. *Id.* § 251(c)(1). A proposed ICA must then be submitted to the state commission for its review and approval.

*Id.* § 252(e)(1)-(2). Any party aggrieved by a "determination" of a state commission under Section 252 may bring an action in the appropriate federal district court "to determine whether the agreement or statement meets the requirements" of Sections 251 and 252. *Id.* § 252(e)(6).

Defendant Core, a CLEC, sought entry into the Maryland local telecommunications market, where plaintiff Verizon was the ILEC. Rather than negotiating and submitting a new ICA, Core opted-in to an existing, Commission-approved ICA between Verizon and another CLEC, then known as American Communication Services of Maryland, Inc. ("ACSI"). The ICA between Core and Verizon consisted of a short-form adoption agreement in addition to the preexisting ICA. (Pl.'s Ex. B.)

Under Definitions, the ICA states, "Interconnection is As Described in the Act, and means the connection of separate pieces of equipment or transmission facilities within, between, or among networks. The architecture of Interconnection may include, but is not limited to, Collocation Arrangements, entrance facilities, and Mid–Span Meet arrangements." (*Id.* § 1.33.) Section 4.0, entitled "Interconnection Pursuant to Section 251(c)(2)," contains various provisions about how the parties will interconnect, including the architecture of the facilities and equipment. (*Id.* § 4.0.) It states that interconnection "shall be established ... in accordance with the standards set forth in subsection 10.2." (*Id.*) Subsection 10.2, in turn, provides, "Unless otherwise agreed to by the Parties, Interconnection shall be equal in quality to that provided by each of the Parties to itself or any subsidiary, affiliate, or third party." (*Id.* § 10.2) The ICA defines "equal in quality" as "the same or equivalent interface specifications, provisioning, installation, maintenance, testing and repair intervals for the same or equiv-

alent services under like circumstances." (*Id.*)

Because Core was not yet ready to interconnect with Verizon when the ICA was adopted, the "Initial Network Implementation Schedule for Maryland" lists all dates, including "Interconnection Activation Date," as "TBD," or to be determined. (*Id.* at Schedule 3.0.) Similarly, the location of interconnection points ("IPs") on each carrier's network are "TBD." (*Id.* at Schedule 4.0.)

On July 7, 1999, Core obtained certification from the PSC as a facilities-based local exchange carrier. (Pl.'s Ex. C, at 8.) On July 27, 1999, Core requested interconnection and an activation date of September 10, 1999—forty-five days following the date of the letter. (Pl.'s Ex. D, at 1.) As required by the ICA, Core provided Verizon with forecasts of Core's trunking requirements and routing information. (*Id.*) The letter stated, "Please confirm in writing if the requested interconnection activation date is acceptable, or, if it is not acceptable, please propose an alternate date, together with an explanation why such alternate date is appropriate." (*Id.*) Verizon did not respond in writing.

The parties met on August 11, 1999, to discuss interconnection. The parties agreed to adopt the "entrance facility" model of interconnection.[1] (Pl.'s Ex. C, at 10.) Entrance facilities are "dedicated transmission facilities that connect ILEC and CLEC locations." *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 585 (D.C.Cir.2004). An entrance facility consists of two multiplexers[2] with a fiber transport between them. (*See* Pl.'s Ex. N, at 16.) Verizon describes four major steps for provisioning initial interconnection with Core using the entrance facility method: 1) constructing the physical interoffice facility between the Verizon and Core networks, 2) provisioning DS–3 transport circuits from Verizon's Tandem to Core's Wire Center, 3) provisioning DS–1 transport circuits riding on the DS–3s, and 4) establishing interconnection trunks between Verizon's switch and Core's switch over the DS–1 transport. (*Id.* at 2 n. 2.)

Core requested interconnection at its Wire Center on the tenth floor of the Court Square Building. The Court Square Building, located about three blocks from Verizon's central office, is known as a "carrier hotel" because many carriers (including Verizon) have facilities there. (Pl.'s Ex. C, at 6, 7.) The Court Square Building was already "on-net" with Verizon, meaning that the building was physically connected to Verizon's central office through underground fiber feeder cables. (*Id.* at 7.) Certain facilities existed in the building prior to Core's interconnection request on July 27, 1999. A fiber riser was installed by Verizon to bring fiber from the basement of the Court Square Building to the tenth floor. (*Id.* at 8.) Verizon also install-

---

1. The contract provides that Core has the sole right and discretion to specify any of three methods for interconnection at any of the Verizon IPs: (1) a physical or virtual collation facility established by Core at Verizon's IP; (2) a physical or virtual collation facility established separately at Verizon's IP by a third party with whom Core has contracted with for that purpose; or (3) an entrance facility and transport leased from Verizon (and any necessary multiplexing), extending to Verizon's IP from a mutually agreed upon point on Core's network. (Pl.'s Ex. B § 4.2.2.) In turn, Verizon has the sole right and discretion to specify any of three methods for interconnection at any of Core's IPs. (*Id.* § 4.2.5.)

2. According to the Hearing Examiner's Proposed Order, a "multiplexer is a device that combines digital channels of one size, such as a DS–1, into a digital channel of a larger size, such as a DS–3. Multiplexing also occurs on optical facilities. For example, a mux ["multiplexer"] is necessary to transition from an OC–1 to an OC–12 facility." (Pl.'s Ex. C, at 8.)

ed a fiber patch panel in the Wire Center to terminate the riser cable and provide for cross connects. (*Id.*) In May 1999, an OC–12 multiplexer ("OC–12 Mux") was installed in the Wire Center and connected to the fiber patch panel. (*Id.*) In June 1999, Verizon "turned up" an existing OC–12 capacity ring ("Existing OC–12 Loop Ring") in the Wire Center, meaning that physical construction was complete, the optical signals were transmitting, and the ring was service-ready. (*Id.* at 7–8.) At some point, however, the OC–12 Mux was disconnected from the Existing OC12 Loop Ring.[3] (*Id.* at 12.)

At the August 11 meeting, Core proposed interconnection using the Existing OC–12 Loop Ring and the OC–12 Mux for interconnection, as this would eliminate the need for Verizon to build new facilities. Verizon representatives agreed that using the Existing OC–12 Loop Ring would be technically feasible. (*Id.* at 11.) Core then requested an interconnection activation date of September 18, 1999. (*Id.* at 10; Pl.'s Ex. D, at 45.) Verizon, however, indicated that the provision of entrance facilities would require twelve to fourteen weeks, rather than the forty-five day period requested by Core.[4] (Pl.'s Ex. D, at 45.)

The parties agree that the Existing OC–12 Loop Ring had sufficient capacity to support Core's initial request for interconnection. (Pl.'s Ex. C, at 11.) However, on August 31, 1999, Verizon informed Core that as a matter of policy, Verizon would not use the Existing OC–12 Loop Ring for interconnection purposes, whether or not it was technically feasible. (*Id.* at 12.) Verizon stated that instead of using the existing ring, it would need to construct a new OC–12 interoffice facility ring ("New OC–12 IOF Ring"), which would be completed by November 16, 1999. (*Id.* at 12–13; Pl.'s Ex. A, at 5.)

Meanwhile, around August 15, 1999, Verizon had informed Core that the OC–12 Mux Core desired to use for interconnection was assigned to another customer and therefore could not be used. (Pl.'s Ex. C, at 11.) Verizon would not provide this customer's name to Core, but it was later revealed that Core itself (in an end-user retail capacity, according to Verizon) was the customer of record. (Pl.'s Ex. A, at 6.) Verizon later agreed to use this multiplexer, but stated to Core on September 7, 1999, that the OC–12 Mux would have to be "reinventoried" as a "carrier" facility in order to use it for interconnection purposes. (Pl.'s Ex. C, at 12.) At that time, Verizon informed Core that the standard interval for delivering an entrance facility was four to six months. (Pl.'s Ex. D, at 25.)

On September 15, 1999, Verizon anticipated a completion date of November 16,

---

**3.** It is disputed whether the ring was disconnected at the time of Core's interconnection request. According to the Proposed Order, "Verizon's witness Albert testified that he believed that the OC–12 Mux was disconnected from the OC–12 loop ring sometime between June 7 and August 11, 1999. Core witness Mingo maintains that the exact date of the disconnection is a red herring, and in any event, the disconnection occurred substantially after the August 11 Meeting." (Pl.'s Ex. C, at 12–13.)

**4.** Throughout these discussions, Core was under the mistaken impression that Verizon was required under the ICA to interconnect with Core within forty-five days. The Hearing Examiner found that the contract provision relied upon by Core in support of this alleged forty-five day obligation did not in fact apply to initial interconnection, and even if it did, the contract language clearly stated that "the interconnection data in a new LATA [Local Access and Transport Area] shall not be *earlier* than forty-five days after receipt by [Verizon] of all complete and accurate trunk orders and routing information." (Pl.'s Ex. L, at 17 [emphasis added].)

1999. (*Id.* at 52.) Core responded on September 24, 1999, that the November 16 date was not acceptable, and that Verizon had not yet articulated a reasonable justification for refusing to use the existing multiplexer for interconnection. (*Id.* at 56.)

Verizon asserts it completed the New OC–12 IOF Ring by November 16, 1999, while Core maintains that Verizon did not complete it until November 30, 1999. (Pl.'s Ex. C, at 13.) Once the New OC–12 IOF Ring was "turned up," the subsequent steps in the interconnection process (DS–3, DS–1, and trunking design) were completed within twenty-four days, by December 23, 1999, just over four months after the initial meeting between Core and Verizon on August 11, 1999. (*Id.*)

In October 1999, Core filed a complaint with the PSC based on Verizon's alleged wrongful delay of interconnection. (*Id.* at 2.) Core filed an amended complaint on January 18, 2001. (*Id.*) The matter was docketed as Case Number 8881 and delegated to the Hearing Examiner Division. (*Id.*) Core asserted five counts against Verizon. (Def. Core's Ex. 2.) In Count I, Core alleged that Verizon "breached section 4.4.4 of the Interconnection Agreement with Core by failing to provide interconnection within the requested 45–day interval, and by refusing to negotiate an alternative interval." (*Id.* ¶ 24.) In Count II, Core alleged that Verizon "breached section 27.1 of the Interconnection Agreement by refusing to provide Core with interconnection on terms and conditions that VZ–MD provides to itself and others." (*Id.* ¶ 32.) Count III alleged that Verizon "breached Section 27.1 of the Interconnection Agreement with Core by refusing to permit interconnection at a technically feasible point." (*Id.* ¶ 43.) In Count IV, Core alleged that Verizon "breached Section 27.1 of the Interconnection Agreement with Core by imposing unjust and unreasonable terms

and conditions on the interconnection process." (*Id.* ¶ 52.) Finally, Count V alleged that Verizon "breached its duty of good faith and fair dealing under the Interconnection Agreement with Core by refusing to provide interconnection within a commercially reasonable time." (*Id.* ¶ 56.)

On March 25, 2002, the Hearing Examiner dismissed Count I of Core's Amended Complaint, ruling that Verizon was not required under the Interconnection Agreement to provide interconnection to Core within forty-five days of Core's request. (Pl.'s Ex. L.) This decision was not appealed.

On August 8, 2003, after extensive briefing and a two-day evidentiary hearing, the Hearing Examiner issued a Proposed Order finding in Core's favor on Counts II through V. (Pl.'s Ex. C, at 38.) The Hearing Examiner stated that Core's separate counts "all boil[ed] down to the assertion that Verizon wrongfully delayed its interconnection with Core." (*Id.* at 33.) Core argued "that Verizon's refusal to use its existing infrastructure to interconnect with Core, and Verizon's insistence on granting Core access only to newly constructed, dedicated facilities, resulted in over a three-month delay in interconnection." (*Id.* at 35.) The Hearing Examiner agreed with Core "that Verizon did not provide interconnection to Core in as timely a fashion as it reasonably would have provided interconnection to any of its own customers." (*Id.* at 38.) Pointing to the FCC's statement that an incumbent LEC is not just and reasonable when it provides interconnection "in a manner less efficient than an incumbent LEC provides itself," the Hearing Examiner found that the "central inquiry" in resolving Core's complaint was "whether Verizon did in fact interconnect with Core on terms less efficient than it would have offered to one of its own customers." (*Id.* at 35.) The Hearing Exam-

iner thus interpreted the word "itself" to mean "its customers."

The Hearing Examiner found "by a preponderance of the evidence that Verizon's failure to reasonably respond to Core's clear signals that it desired speedier interconnection was unreasonable and contrary to Verizon's responsibilities under the Act." (*Id.* at 38.) The Hearing Examiner's discussion of the merits focused on Verizon's "passive[ ] adhere[nce] to its own interpretation of the parties' Interconnection Agreement." (*Id.* at 35.) Amendment was a permissible way for the parties to achieve faster interconnection than described in the ICA, according to the Hearing Examiner. (*Id.* at 36.)

Addressing Verizon's argument that Verizon would have violated the ICA had it provided interconnection using the Existing OC–12 Loop Ring, given the lesser quality, the Hearing Examiner stated that "[q]uality specifications and Verizon's liability concerns could have been negotiated and addressed in a redrafted Agreement." (*Id.* at 37.) According to the Hearing Examiner, "Verizon must not impede competition by rigid adherence to an amendable agreement that a CLEC wishes to amend." (*Id.* at 39.) The Hearing Examiner found that "when a CLEC makes known to Verizon, as Core did here, that it desires accelerated interconnection, Verizon cannot reasonably decline to offer to negotiate appropriate changes to interconnection agreements or other documents, or to work with the CLEC to achieve interconnection in a manner acceptable to both." (*Id.*)

On appeal to the PSC, Verizon asserted that the Hearing Examiner reached the legally impermissible conclusion that Verizon was liable because it rigidly adhered to the terms of the ICA. (Pl.'s Ex. M, at 1.) Verizon emphasized the Hearing Examiner's purportedly faulty conclusion that even though Verizon was contractually ob-

ligated to provide interconnection over the higher quality IOF facilities, Verizon was required under the Act to offer to negotiate an amendment to accommodate Core's request to interconnect over lesser quality loop facilities. (*Id.* at 1–2.) Verizon claimed that the Hearing Examiner erred by imposing upon Verizon a general duty to offer to negotiate changes to interconnection agreements when requested. (*Id.* at 8.)

On February 26, 2004, the PSC affirmed the Hearing Examiner's Proposed Order in conclusion that Verizon wrongfully delayed interconnecting with Core by refusing to interconnect over the Existing OC–12 Loop and multiplexer facilities. (*Id.* at 5, 7.) The PSC concluded it was "clear that interconnection of Core over the existing facility was proposed by Core and could have been accomplished in an expeditious manner, apparently sometime around mid-September 1999 as requested by Core, but Verizon refused to do so until construction of new facilities which did not result in interconnection until apparently December 23, 1999." (*Id.* at 6.)

In support of this conclusion, the PSC found that "capacity was available and connection technically feasible on an existing Verizon OC–12 loop ring and OC–12 multiplexer, which Core proposed to service the interconnection." (*Id.* at 5.) The PSC concluded that Core's proposal to utilize the Existing OC–12 Loop constituted Core's acceptance of that facility as compliant with the ICA. (*Id.* at 6–7.) The PSC found that Verizon did not inform Core of the concern that the Existing OC–12 Loop would be of "lesser quality" and in violation of the ICA until the hearing before the Hearing Examiner. (*Id.*) Nor did Verizon inform Core that the other customer assigned to the Existing OC–12 Loop was in fact Core. (*Id.* at 6.) The PSC found that this showed a lack of full disclosure and a

failure to deal in good faith on the part of Verizon, as well as improper delay that could have been avoided had Verizon agreed to use the existing facilities as proposed by Core. (*Id.* at 7.)

Verizon filed a motion for reconsideration and rehearing. Verizon challenged the PSC's finding that Verizon did not inform Core until the hearing before the Hearing Examiner that the Existing OC–12 Loop Ring could not be used because of its lesser quality. Verizon also moved the PSC to reconsider its conclusion that Verizon denied Core's request to use the existing multiplexer on the grounds that it was assigned to someone else. (Pl.'s Ex. N, at 7–14.) In addition to challenging those findings, Verizon reasserted that it acted in good faith to achieve interconnection, that there was no independent cause of action for breach of an implied duty of good faith and fair dealing, and that the PSC erred in concluding that Verizon constructed a separate "loop ring" to interconnect with Core. (*Id.*)

On July 9, 2004, the PSC issued Order Number 79259, denying Verizon's petition and reaffirming the Proposed Order. (Pl.'s Ex. K.) In response to Verizon's claims that Order Number 78989 contained "additional, unwarranted and erroneous factual findings beyond those it asserts were already made in the [Proposed Order]," the PSC found that "[w]hile in Order No. 78989 the Commission elaborated to a greater extent than the Hearing Examiner did with regard to the transactions between Verizon and Core, the discussion by the Commission is fully supported by the record." (*Id.* at 2.) The only argument the PSC addressed on the merits was whether Maryland law provided an independent cause of action for breach of an implied duty of good faith and fair dealing. (*Id.*) The PSC did not explicitly rule on this issue, but stated that Verizon's duty could be construed as an implied duty of

fair dealing as well as a duty under the ICA; in any event, Verizon fulfilled neither duty. (*Id.* at 3.) The PSC "affirm[ed] the Hearing Examiner's findings that Verizon breached the Interconnection Agreement and also failed to negotiate in good faith." (*Id.*) Verizon seeks review of the PSC's Orders.

## II.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On review of state commission decisions, "general standards for judicial review of agency action apply." *GTE S., Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir.1999). Factfindings made by the state commission are reviewed under the substantial evidence standard. In applying this standard, the court does not "sit as a super public utilities commission," and is " 'not free to substitute its judgment for the agency's.' " *Id.* at 745–46 (*quoting AT & T Wireless PCS, Inc. v. City Council of City of Virginia Beach*, 155 F.3d 423, 430 (4th Cir.1998)). Instead, the court "must uphold a decision that has 'substantial support in the record as a whole' even if it might have decided differently as an original matter." *AT & T Wireless*, 155 F.3d at 430 (*quoting NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir. 1997)).

The state commission's interpretations of federal law, including the 1996 Act, are reviewed *de novo. GTE S.*, 199 F.3d at 745. However, even under the *de novo* standard of review, "an order of a state commission may deserve a measure of respect in view of the commission's ex-

perience, expertise, and the role that Congress has given it in the Telecommunications Act." *BellSouth Telecomms., Inc. v. Sanford,* 494 F.3d 439, 447 (4th Cir.2007). The amount of respect given "will vary in accordance with 'the degree of the agency's care, its consistency, formality, and relative expertness,' as well as 'the persuasiveness of the agency's position.'" *Id.* at 448 (*quoting United States v. Mead,* 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). Therefore, the court must review the decisions of the state commission "with a respect for the Commission's special role in the regulatory scheme, its freedom to maneuver in that role, its expertise and experience, and the care it has taken in the particular task of forming its orders." *Id.* at 449.

### III.

In this appeal, Verizon asserts that the PSC based its conclusion that Verizon breached the ICA and wrongfully delayed interconnection with Core on erroneous interpretations of federal law. Verizon specifically challenges the PSC's finding that federal law and the ICA required it to connect with Core using loop facilities. Verizon alleges that the PSC reached this conclusion by erroneously creating a duty for Verizon to negotiate an amendment to the ICA, or, alternatively, by erroneously finding that Core had consented to a valid modification to the ICA.

#### A. "Equal in Quality" Standard

■ Verizon claims that the PSC misconstrued federal law when it assessed the "equal in quality" standard using services provided to retail customers as a comparison. Verizon argues, as it did before the Hearing Examiner and the PSC, that federal law and the ICA require interconnection equal in quality not to that provided to

retail customers, but to interconnection provided to itself and other carriers. I agree.

The 1996 Act requires ILECs to provide interconnection to requesting CLECs "that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection" and is provided "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(D). The rule promulgated by the FCC implementing this standard states that interconnection is required "at a level of quality that is equal to that which the incumbent LEC provides itself, a subsidiary, an affiliate, or any other party. At a minimum, this requires an incumbent LEC to design interconnection facilities to meet the same technical criteria and service standards that are used within the incumbent LEC's network." 47 C.F.R. § 51.305(a)(3).

Before the Hearing Examiner, Core argued that the "equal in quality" interconnection standard required Verizon to provide interconnection on the same time twenty business-day time interval Verizon provided for retail customers requesting DS-3 special access circuits, which Core asserted were technically identical to the DS-3 interconnection circuit requested by Core. (Pl.'s Ex. C, at 14.) The Staff of the PSC agreed, arguing in the proceedings below that the "equal in quality" standard required a comparison to Verizon's retail customers, and consequently Verizon should have provided interconnection over the Existing OC-12 Loop Ring. (*Id.* at 20–21.)

Verizon claims that a connection over a loop facility, such as the Existing OC-12 Loop Ring Core requested to use, is lesser in quality than interconnection over IOF.[5]

---

**5.** As a factual matter, Core asserts that Verizon has not established that it provides a

lesser quality of service to its retail customers.

Interoffice facilities (IOF) consist of two fiber multiplexers with a fiber transport between them, creating a dedicated path between the two networks. Loop facilities, in contrast, can connect multiple end user customer locations with numerous multiplexers within a wire center to the ILEC central office.[6] Verizon Maryland used only interoffice facility configurations for its own interoffice trunks and for trunk interconnection with other carriers. (Pl.'s Ex. N, at 17.) Verizon asserts that had it followed Core's request to provide interconnection over the lesser quality Existing OC–12 Loop Ring, it would have been in violation of Section 251 and the ICA.[7]

The PSC erred by evaluating "equal in quality" using Verizon's provision of services to large retail customers as a comparator. Using an ILEC's provision of services to retail customers to determine whether an ILEC has provided interconnection that is "equal in quality" does not comport with the clear language of the statute. The FCC's regulation reaches the same conclusion, providing that "[a]t a *minimum*" the ILEC must provide interconnection with the same level of quality that is used within its own network. 47 C.F.R. § 51.305(a)(3). Indeed, were the

statute to permit ILECs to connect with potential competitors using the inferior facilities provided to retail customers, ILECs could stifle competition by refusing to provide the same quality to potential competitors that it provides to itself.

Core next argues that the ICA is broader than the statute and allows a comparison of retail customers to evaluate the equal in quality standard. Section 10.2 of the ICA provides that interconnection must be "equal in quality to that provided by each of the Parties to itself or any subsidiary, affiliate, or third party." Core claims that "third party" can mean "large retail customers." (Core Mem. 20–21.)

However, other provisions in the ICA make clear the contract's meaning. The very next sentence of Section 10.2 provides that " 'equal in quality' means the same or equivalent interface specifications, provisioning, installation, maintenance, testing and repair intervals for *the same or equivalent services under like circumstances.*" (Pl.'s Ex. B § 10.2 [emphasis added].) Services provided to retail customers are not "the same" as or "equivalent" to interconnection. Indeed, Verizon does not "interconnect" with retail customers. Moreover, the ICA between Verizon and Core

---

(Core Commc'ns, Inc.'s Opp'n to Pl.'s Mot. for Summ. J. ["Core Mem."] 24.) No factual finding was made before the Commission on this issue. I note that a letter written by the PSC in another proceeding accepts Verizon's assertion that loop facilities are of lesser quality than IOF facilities. (Pl.'s Ex. J, at 6.)

**6.** The PSC recounts in its Order that "Verizon indicated it would construct a new loop ring as a dedicated facility for Core." (Pl.'s Ex. A, at 5.) The language used by the PSC is troubling, as it reflects a fundamental misunderstanding of the key issue disputed by the parties: Verizon claims it was required to construct a new *interoffice entrance facility*, which contributed to the delay, because the *existing loop ring* was of lesser quality than the interoffice facilities Verizon itself uses. Verizon did not claim, as the language in the

Order would indicate, that it was constructing a new lesser-quality *loop* facility.

**7.** Core alleges that Verizon did not mention the quality concern regarding the loop facility until it initiated the litigation against Verizon; therefore, Core did not know that it should request a modification of the Agreement. (Core Mem. 23–25.) In response, Verizon points to a September 7, 1999 e-mail to Core stating that Verizon must build an entrance facility with two multiplexers. (Pl.'s Ex. D, at 25 ["As I've explained to Mr. Mingo on more than one occasion, a single entrance facility consists of two muxes and a facility between them. Thus, even if we can use the muxes at Core's POPs, for each entrance facility we will still need to build a second mux at the [Verizon] central office."].)

expressly incorporates the statute and regulations, providing: "[Verizon] shall provide the Interconnection ... in accordance with the performance standards set forth in Section 251(c) of the Act and the FCC Regulations, in particular the rules set forth in 47 Code of Federal Regulations §§ 51.305(a)(3) to (a)(5)...." (*Id.* § 27.1.) Additionally, the ICA provision governing joint implementation and grooming process states that the parties shall define "standards to ensure that Interconnection trunk groups experience a grade of service, availability and quality which is *comparable to that achieved on interoffice trunks within [Verizon]'s network* and in accord with all appropriate relevant industry-accepted quality, reliability and availability standards." (*Id.* § 10.1(a) [emphasis added].) It is evident that the use of the word "third party" in Section 10.2 of the ICA refers to third parties provided "the same or equivalent services" by Verizon—namely, other carriers to which Verizon interconnects.

Therefore, I find that the PSC misconstrued federal law and the ICA in evaluating the "equal in quality" interconnection standard against Verizon's end-user retail customers.[8] Given that the PSC's finding of a violation of the ICA was largely based on Verizon's refusal to connect with Core over the existing loop facility, the PSC's Orders are vacated.

**B. Duty to Amend or Negotiate Amendments**

■ Verizon alleges that the PSC ruled, contrary to federal law, that Verizon had a duty to and should have amended its interconnection agreement with Core to allow interconnection using lesser-quality loop facilities. Verizon also asserts that the PSC misconstrued federal law by finding that the duty to negotiate interconnection agreements in good faith, a requirement under Section 251(c) of the 1996 Act, also encompasses a duty to negotiate *amendments* to interconnection agreements.

It is difficult to discern whether the PSC in fact adopted the portion of the Hearing Examiner's Proposed Order finding that Verizon should have offered to amend the ICA. The PSC Order states, "While the Proposed Order contains references to possible amendment of the ICA to achieve the interconnection, the facts as presented (and not in dispute) show Core's proposal to utilize the existing loop interconnection to meet its time objective would essentially constitute Core's acceptance of the shared facility as being in compliance under the ICA." (Pl.'s Ex. A, at 6–7.) Somewhat contradictory is the PSC's Order on Reconsideration, which affirmed "the Hearing Examiner's findings that Verizon ... failed to negotiate in good faith." (Pl.'s Ex. K, at 3.) In so affirming, the PSC cited to the portions of the Hearing Examiner's Order that concerned amending the agreement. (*See id.* at 3 n. 7 [*citing* Pl.'s Ex. C at 35–38].) It is unclear the basis for which the PSC found a duty to negotiate in good faith amendments at the unilateral request of Core, if the PSC indeed intended to adopt that portion of the Hearing Examiner's opinion.

---

**8.** The PSC seemed to indicate that even if the ICA required interconnection over an interoffice facility, a modification of the contract was achieved because "Core's proposal to utilize the existing loop interconnection to meet its time objective would essentially constitute Core's acceptance of the shared facility as being in compliance under the ICA." (Pl.'s Ex. A, at 6–7.) However, concerning modifi- cations of the ICA, the contract provides: "No modification, amendment, supplement to, or waiver of the Agreement or any of its provisions shall be effective and binding upon the Parties unless it is made in writing and duly signed by the Parties." (Pl.'s Ex. B § 29.19.) According to its terms, the contract could not have been modified by Core's unilateral request.

■ The PSC's finding that Verizon breached the ICA necessarily includes a finding that Verizon was required under the ICA to connect with Core in the way Core requested. If that were true, no amendment would be necessary. Indeed, Core asserts that it "never claimed that Verizon was required to amend the ICA." (Core Mem. 28.) Moreover, Section 251(c) "does not mandate that incumbent LECs cater to every desire of every requesting carrier." *Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 813 (8th Cir.1997), *aff'd in part and rev'd in part on other grounds by* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Verizon was under no obligation to amend the ICA to allow interconnection through lesser-quality facilities.

## C. Duty of Good Faith and Fair Dealing

■ The PSC found that Verizon breached its duty to provide interconnection in a commercially reasonable manner—in other words, its duty of good faith and fair dealing. (Pl.'s Ex. C, at 29.) Core based this claim in the proceedings before the PSC on Verizon's withholding of the "true nature of Verizon's objections to Core's requested interconnection," which made it impossible for Core to address Verizon's concerns. (*Id.* at 30.) Core maintained that Verizon "made every attempt to prevent Core from achieving interconnection within a reasonable time frame," by failing to inform Verizon of the reasons for its refusal to interconnect using the Existing OC–12 Loop Ring and OC–12 Mux. (*Id.*) Core points specifically to Verizon's statement that the multiplexer had been assigned to a "customer of record" other than Core, when in fact the

customer of record was Core itself. (*Id.*) Core also points to Verizon's later statement that the equipment needed to be reinventoried from customer to carrier facility. (*Id.* at 30–31.) Verizon correctly challenges the PSC's conclusion in its original order that there is an independent cause of action under Maryland law for breach of an implied duty of good faith and fair dealing. As the PSC appeared to recognize upon reconsideration, while a negotiated contract contains an implied duty of good faith and fair dealing, "Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing. A breach of that implied covenant simply supports 'another cause of action at law, *e.g.,* breach of contract[.]' " *Cutler v. Wal–Mart Stores, Inc.,* 175 Md.App. 177, 927 A.2d 1, 11 (Md.Ct.Spec.App.2007) (*quoting Mount Vernon Props., LLC v. Branch Banking & Trust Co.,* 170 Md.App. 457, 907 A.2d 373, 381 (Md.Ct.Spec.App.2006)) (alteration in original).

In its reconsideration order, the PSC based its finding of liability instead on a *contractual* duty found in the ICA. As discussed above, the duties under the contract may need to be reevaluated given my determination that the "equal in quality" standard is assessed using other carriers and Verizon itself as a comparator, not Verizon's retail customers.

For the foregoing reasons, summary judgment is granted for plaintiff and PSC Orders 78989 and 79259 are vacated.[9] A separate order implementing this ruling follows.

---

**9.** This court has no authority to remand this action for further proceedings. If Core or the PSC believe further proceedings are necessary given the interpretations of federal law stated in this opinion, they should proceed accordingly. For example, further factual findings related to the "equal in quality" standard may be needed. (*But see* Pl.'s Ex. J, at 6.)

## ORDER

For the reasons stated in the accompanying Memorandum, it is, this 30th day of June 2009,

ORDERED:

1. Plaintiff Verizon Maryland Inc.'s motion for summary judgment is granted;

2. Maryland Public Service Commission Order Nos. 78989 and 79259, *In re Complaint of Core Communications, Inc. v. Verizon Maryland Inc.,* Case No. 8881, are vacated; and

3. Judgment is entered in favor of plaintiff against defendants.